UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HATTIE TANNER,

      Plaintiff,

                                 Case No. 1:19-cv-849

v.

                                 Hon. Hala Y. Jarbou

DAVID WALTERS, et al.,

      Defendants.

_____/

## OPINION

Plaintiff Hattie Tanner brings a civil rights action under 42 U.S.C. § 1983 against Defendant David Walters for fabrication of evidence, malicious prosecution, and a *Brady* violation in violation of her Fourth and Fourteenth Amendment rights. Plaintiff also brought claims against Defendant City of Battle Creek. On May 25, 2022, the Court granted a stipulation dismissing Battle Creek as a defendant. (5/25/2022 Order, ECF No. 106.) Before the Court is Defendant Walters's motion for summary judgment. (ECF No. 89.) For the reasons stated below, the Court will grant in part and deny in part Defendant's motion.

## I.  PROCEDURAL HISTORY

In 2000, a jury convicted Plaintiff of second-degree murder, felony murder, and armed robbery. In 2003, the Michigan Court of Appeals reversed Plaintiff's conviction, holding that the trial court had denied Plaintiff a fair trial when it failed to appoint expert assistance for her. *People v. Tanner*, 660 N.W.2d 746 (Mich. Ct. App. 2003). However, the Michigan Supreme Court reversed and reinstated Plaintiff's conviction. *People v. Tanner*, 671 N.W.2d 728 (Mich. 2003). Subsequently, Plaintiff filed a writ of habeas corpus, which the federal district court of the Eastern District of Michigan denied. *Tanner v. Yukins*, No. 04-CV-71155-DT, 2005 WL 2994353 (E.D. Mich. Nov. 7, 2005). In 2017, the Sixth Circuit found that Plaintiff was convicted based on

insufficient evidence, reversed the district court's denial of habeas corpus, and set aside Plaintiff's conviction. *Tanner v. Yukins*, 867 F.3d 661 (6th Cir. 2017). Plaintiff then filed this § 1983 claim.

## II. FACTUAL BACKGROUND

The factual background of this case has been laid out by several courts. The Sixth Circuit's version is laid out below.

### A. The Crime Scene

Sharon Watson, a bartender at Barney's Bar and Grill, was stabbed to death in the basement of Barney's sometime after 1:00 a.m. on March 22, 1995. *People v. Tanner*, 255 Mich.App. 369, 660 N.W.2d 746, 751 (2003). Watson's murder appears to have happened during the course of a robbery. *Id.*

Watson's boyfriend, Jerry Dockum, testified that at around 1:30 a.m. on March 22, Watson called him to tell him that she was closing the bar early. *Id.* at 752. When Watson was not home by 2:00 a.m., Dockum grew concerned and called the bar. *Id.* No one answered. *Id.* Dockum contacted Watson's sister, Gloria Loring, who eventually went to Barney's accompanied by Maria Coller, a former Barney's employee who had keys, and Maria Coller's husband, Ron Coller. *Id.* at 753. Loring and the Collers arrived at Barney's around 5:30 a.m. *Id.* When they arrived, the lights were on, the television was blaring, the outside doors were locked, and Watson's car was in the parking lot behind the bar. *Id.* A pack of Budweiser was on the floor near the side door with a napkin on top of it. *Id.* A note for a takeout order of beer was on the cash register behind the bar. Watson's coat was on the back of a chair, and Watson's purse was on the back of the bar. *Id.* There was a knife behind the bar. *Id.*

Shortly after arriving, the Collers called 911 and Barney's owners. After Mr. Coller opened the door to the basement and observed loose cash at the bottom of the stairs, Mrs. Coller called 911 a second time. When they noticed that the door to the basement office was closed, Mrs. Coller called 911 a third time. *Id.* After one of Barney's owners, Tom Bliler, arrived, they opened the door to the basement office. *Id.* They found Watson's body in the basement. *Id.* Bliler estimated that $1,009 had been stolen from the safe, suggesting robbery. *Id.*

Detective Michael VanStratton, who at the time was the crime lab supervisor of the Battle Creek Police Department, arrived at the scene. He testified that Watson had blood stains smeared across her body, an excessive amount of blood on her neck and chest, and stab wounds to her chest. *Id.* at 753-54. Because of the disarray in the office and the wounds to Watson's arms, VanStratton concluded that there had been a struggle. *Id.* Crime-scene technicians found "diluted bloodstains on the stainless steel sink area directly behind the bar." *Id.* In addition to the items the Collers had already noticed—namely, the six pack of beer with the napkin on it, the

2

note about the take-out beer order, the knife, and Watson's purse—technicians also found two drinking glasses and a cash register receipt.  *Id.*  In the basement, technicians found a bloodstain on the wall at the bottom of the stairs.  *Id.* at 754.

VanStratton had originally arrived at Barney's around 7:00 a.m. without the necessary equipment to process the crime scene.  *Id.* at 753.  VanStratton testified that when he returned to Barney's with the necessary equipment around 8:00 a.m., "'some of the areas which [he] thought might be critical for investigation'"— including the area behind the bar—"'had already been occupied by people that came in that morning.'"  *Id.*  There were about seven non-law-enforcement people in Barney's, including Watson's friends and Barney's employees.  *Id.* at 754.  People were making coffee behind the bar and were in the area where the bloodstains, knife, and takeout beer were found.  *Id.*  "Detective VanStratton testified that because 'there was some important evidence behind the bar,' it was the first area that was isolated," although people had gathered and made coffee in that area earlier in the morning, before law enforcement isolated it.  *Id.* at 753-54.

B. Witness Accounts

Detective David Walters of the Battle Creek Police Department focused the investigation on Tanner, Dion Paav, and Robert Cady.  *Id.* at 751, 755.  On May 24, 1995, Walters interrogated Tanner and made an audio recording of the interrogation.  *Id.* at 755.  According to Walters's trial testimony, Walters showed Tanner a photograph of the knife recovered from the crime scene.  Walters testified that Tanner said the knife was hers and that she recognized it by the alteration she had made to the blade for cleaning crack pipes.  *Id.*  On cross-examination, Walters acknowledged that the transcript of the audio recording shows Tanner saying that the knife was not hers.  *Id.* at 757.  Walters conceded that Tanner's answers to many questions were inaudible in the recording.  *Id.*  Walters also testified that although the thirty-two page transcript included 261 instances where Tanner's response is transcribed as "inaudible[ ]" Walters did not send the tape to the Michigan State Police Crime Laboratory to enhance the sound quality.  *Id.*

Walters testified that he interviewed Tanner about Watson's murder again on June 7, 1995.  *Id.* at 756.  This interview took place in a police car, with Detective David Adams also present.  *Id.*  According to Walters, during this interview Tanner admitted to accompanying Cady to Barney's around the time of Watson's murder.  *Id.*  Walters testified that Tanner said she stayed in the car while Cady went inside, and that after she and Cady left Barney's, they bought beer, cashed a check, and purchased crack.  *Id.*  Walters testified that he asked Tanner whether she was responsible for killing Watson, and she shook her head no.  *Id.*  Walters testified that he asked what circumstances might have led her to commit that sort of murder, Tanner responded that she might have done so "'if that bitch had treated her bad.'"  *Id.*  There is no audio recording of this interview, and Detective Adams, who was also in the police car during the interview, did not testify.

3

Tanner also testified at trial and characterized her answers about the knife differently than Walters did. *Id.* at 760. Tanner testified that she told Walters that the knife in the photo looked like a knife she used to have but was not her knife. *Id.* She testified that she told Walters it could not be hers because it was a straight-bladed knife and her knife was a folding knife. *Id.*

Additionally, a friend of Watson, Catherine Huskins, testified that Watson had found a nonfolding knife before she was murdered. *Id.* Watson told Huskins's husband that she was going to keep the nonfolding knife in her purse. *Id.* Huskins never saw the knife that Watson apparently carried in her purse; she only heard about it from Watson. *Id.*

According to Cady's trial testimony, on March 21, 1995 he got off work at approximately 10:55 p.m. *Id.* at 751. He had planned to meet Paav after work, but could not reach him. *Id.* After midnight on March 22, Cady called Tanner, drove to her house, and went with her to purchase crack cocaine. Cady and Tanner returned to Tanner's house and smoked the crack. *Id.* Approximately a half hour later, Cady left, without Tanner, to cash a check at Barney's. *Id.* He arrived at Barney's around 1:00 a.m. *Id.* Barney's appeared to be closed, but Cady entered through the open side door. *Id.* at 751–52. Watson was at the bar working, and there was a white male who Cady did not recognize in the bar. *Id.* Watson told Cady that she could not cash his check because she had already closed out her cash register. *Id.* at 752. Cady indicated that Watson would close out her cash register with customers in the bar only if they were trusted regular customers, and that Watson would close out her cash register with Cady in the bar. *Id.* at 752–53.

Cady then went to Green's Tavern, where he was able to cash the check. *Id.* at 752. He also had a beer while at Green's Tavern. *Id.* At around 1:30 a.m., Cady called Tanner to tell her he was going to return to her house. *Id.* Cady went to buy more crack and then returned to Tanner's house, arriving around 2:30 a.m. *Id.* He drove home around 2:45 a.m. *Id.* On his way home, he passed by Barney's and noticed that the lights were on. *Id.* He found it unusual for Barney's light to be on at that time, but he continued driving home without stopping. *Id.*

Tanner's trial testimony about the night of March 21 mirrored Cady's. *Id.* at 760. She testified that Cady came to her house where they smoked crack together and then he left to go cash a check. *Id.* She testified that he returned to her house after cashing the check and then left again around 2:30 or 3:00 a.m. *Id.* She testified that she did not go anywhere with Cady except to purchase crack around 12:00 a.m. *Id.* She specifically said she did not go to Barney's. *Id.*

Other witnesses also corroborated aspects of Cady's and Tanner's accounts of that night. Tanner's mother testified that Cady was at her house when she woke up in the morning, and that neither Cady nor Tanner had any blood on them. *Id.* Todd Green testified that Cady did go to Green's Tavern after midnight, where he cashed a check, drank a beer, and made a telephone call. *Id.*

4

Two witnesses spotted a truck and unidentified individuals outside of Barney's. Kevin Sage testified that he saw a light-colored truck with a wooden cap at Barney's around 1:15 a.m. Sage said that the driver appeared to be a white man with a beard, and that there was a passenger who Sage did not get a good look at. *Id.* Nancy Chantrene testified that at 2:47 a.m. she passed Barney's on her way to work and she saw a light-colored truck with a cap parked at the bar. *Id.* at 760–61.

C. Charges

The Battle Creek Police Department sought warrants for Tanner, Paav, and Cady. *Id.* at 751. In the fall of 1995, the prosecutor refused to issue the warrants because, in the prosecutor's view, there was insufficient evidence. *Id.* at 751. A new prosecutor took office in 1997. *Id.* In May 2000, a warrant was issued for Tanner, but not for Paav or Cady. *Id.* The warrant charged Tanner with open murder, felony murder, and armed robbery. *Id.* As far as the record in this case reveals, neither Cady nor Paav was ever charged with any crime related to Watson's murder.

*Tanner v. Yukins*, 867 F.3d 661, 663-66 (6th Cir. 2017).

## III. STANDARD

### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)). "Courts consider the evidence in light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013).

### B. Qualified Immunity

"Qualified immunity is an affirmative defense that protects government officials from liability 'when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights.'" *Webb v. United States*, 789 F.3d 647, 659

(6th Cir. 2015) (quoting *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007)).  Under § 1983, officers are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Id.*  This legal principle must "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590.  It is not necessary for there to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "[C]ourts have discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first." *Ashcroft*, 563 U.S. at 735.  The plaintiff bears the burden of showing that the officer is not entitled to qualified immunity.  *See LeFever v. Ferguson*, 645 F. App'x 438, 442 (6th Cir. 2016).

## IV. ANALYSIS

Defendant seeks summary judgment on several grounds.  First, Defendant argues that Plaintiff's fabrication of evidence and malicious prosecution claims cannot succeed on the merits. Second, even if Plaintiff can succeed in showing these constitutional violations, Defendant argues he is entitled to qualified immunity because Plaintiff's rights were not clearly established at the time.  Further, Defendant argues collateral estoppel precludes Plaintiff from relitigating the issues of probable cause and fabrication of evidence.  Lastly, Defendant argues he committed no *Brady* violation.

6

### A. Fabrication of Evidence

#### 1. Merits

"The basis of a fabrication-of-evidence claim under § 1983 is an allegation that a defendant 'knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)). "'A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant.'" *Jacobs v. Alam*, 915 F.3d 1028, 1042 (6th Cir. 2019) (quoting *Stemler*, 126 F.3d at 872).

Plaintiff alleges that Defendant fabricated the following statements in his investigation report that he prepared after the June 7, 1995, interrogation in a squad car:

- That [Plaintiff] had been in the Barney's Bar parking lot with Cady at approximately 1:00 a.m. on March 22, 1995 and left with him at approximately 1:30 a.m.;

- That the knife with the victim's blood would likely have her fingerprints on it, as well as her friend, Dion Paav;

- That although [Plaintiff] denied killing Watson, she said that she could kill Watson "if that bitch had treated her bad she would do something to that effect."

(Compl. ¶ 25, ECF No. 1.)

Plaintiff further alleges that Defendant similarly testified to the following fabricated statements at the preliminary exam held to determine probable cause:

- That during the May 24, 1995 recorded interview, he showed Plaintiff a picture of the murder weapon, a knife, and she responded that she thought it was one of hers;

- That during the June 7, 1995 interview, Plaintiff admitted that she went to Barney's Bar at about 1:00 a.m. and waited in the parking lot while he [Cady] went into the bar, a fact she had previously denied;

- That Plaintiff stated her fingerprints, as well as those of Dion Paav, would likely be on the knife because they had used it approximately one week before while smoking crack cocaine.

(*Id.* ¶ 40.)

### (a) Defendant's statement that Plaintiff said the knife was hers

Defendant contends that his testimony and documentation of Plaintiff's statement that the knife was hers was not a fabrication.  Defendant points to Plaintiff's own words in the May 24, 1995, audio-recorded interview as support.  The portion of the transcript, which is incomplete, is reproduced below:

Q:  Hey you ever seen that knife before?

A:  (INAUDIBLE)[1]

Q:  I don't know.  Have you ever seen that knife before.

A:  I don't know, but that looks like one of my knives.

Q:  Looks like one of your knives.

A:  (INAUDIBLE)[2]

Q:  Yeah, is that, is that one of your old knives.

A:  Eh hmm (negative)

Q:  It looks like one of your knives.

A:  (INAUDIBLE)[3] goes up.

. . . .

Q:  Could you have ever had a knife like that.

---

[1] Defendant provided an audio recording of this interview.  While the transcript indicates that much of the interview is inaudible, this is due to the manner and speed with which Plaintiff speaks, rather than to technological recording issues.  Here, Plaintiff appears to be saying, "That knife close up?"

[2] ". . . close up in here?  If not . . . back . . . no . . . no.  I'm talkin' bout that's not the one I had in my pocket . . . you push the button in the back."

[3] "Don't think so.  It don't got no button you push in the back.  It goes up.  You know, it can't close up cause like I said I file them on the ends sometimes."

A: Well I used to have something like that (INAUDIBLE) in my back pocket (INAUDIBLE).

(5/24/1995 Interview Tr. 200-01, ECF No. 93-6.)  Plaintiff points out that this transcript was the work product of the "employees of the Police Department in [their] Records Division," and not the work of a certified court reporter.  (Walters Dep. 78, ECF No. 99.)  Plaintiff argues that the "inaudible" portions of the interview audio suggest that she denied the knife was hers because it was a fixed blade knife, and her knife folds up.  (*See* footnotes 1-3; Br. in Supp. of Pl's Resp. to Def.'s Mot. for Summ. J. 17, ECF No. 95.)  This was necessary for her knives because she files them on the end.  (5/24/1995 Interview Tr. 201; Tanner Dep. 150, ECF No. 93-23.)  Plaintiff's deposition supports this interpretation of the audio as she explained:

A      I asked him did it fold.

Q      You asked him if this knife folded?

A      Yeah.

Q      Okay.  And that's where we're going to get to.  Because he asked you:
        "Yeah, is that one of your old knives?"  And you said, they spelled it E-H
        second word H-M-M, but they said negative.  So I'm guessing that was –

        Mr. Mueller:  Like you denied.

A      I do.  It don't fold.

(Tanner Dep. 150.)  Plaintiff's statements that it "looks like" one of her knives or that she used to have "something like that" is not an admission that the knife belongs to her.  Because the audio appears to support Plaintiff's interpretation, viewing the evidence in the light most favorable to Plaintiff, there is a question of fact for the jury to determine whether Defendant fabricated his definitive statements that Plaintiff admitted the knife was hers.

### (b) Defendant's statement that Plaintiff said that her fingerprints would be on the knife

Defendant argues that the records show that Plaintiff made other statements about her fingerprints on the knife apart from those Defendant included in his investigation report and later testified to at the preliminary hearing.  Defendant points to a transcript of a police interview with Dion Paav.[4]

> A.    Once she called me at Rob's.
>
> Q.    Tell me exactly. . . .
>
> A.    . . . . called collect. . . .
>
> Q.    Interrupted. . . .
>
> A.    Like I said, I could hardly understand her; but all she mentioned was something about fingerprints.  They had her in jail and something about the knife.

(Paav Interview Tr. 48, ECF No. 93-21.)  This vague and inconclusive statement is not evidence to show that there is no dispute that Plaintiff made a statement about her fingerprints being on the knife.  It appears that even Paav is unsure of what Plaintiff said during the call.  There is a genuine issue of material fact for the jury to determine whether Defendant fabricated his statement that Plaintiff said her prints would be on the knife.[5]

### (c) Defendant's statement that Plaintiff admitted that she was in the parking lot of Barney's

Defendant points to an affidavit from Officer Swabash, who conducted the polygraph examination of Plaintiff.  Officer Swabash averred that "Ms. Tanner stated that she and Rob Cady

---

[4] Plaintiff's brief refers to this individual as "Paav."  Defendant's brief refers to this individual as "Paavo."  The Court will defer to the name used by the Sixth Circuit in *Tanner v. Yukins*, 867 F.3d 661 (6th Cir. 2017) and will refer to this individual as "Paav."

[5] Defendant also points to his investigative report as evidence to show that Plaintiff made this statement.  This does not eliminate the factual dispute.

travelled to Barney's Bar the night of the murder so that Rob could cash a check so that they could buy more crack cocaine," and that "she further stated that Rob went inside Barney's Bar to cash the $50.00 check while she waited in Rob's car in the parking lot of Barney's Bar." (Swabash Aff. ¶¶ 23-24, ECF No. 93-15.)  Defendant also points to a police interview with Constance Roberts, a woman who shared a cell with Plaintiff when Plaintiff was in custody on unrelated charges. Roberts stated that Plaintiff talked openly with other inmates about the Watson murder case.  It is from another inmate that Roberts learned third-hand about what Plaintiff had said, including having been in the parking lot of Barney's Bar on the night of the murder.  (Roberts Interview, ECF Nos. 93-19, 93-20.)

Nevertheless, Plaintiff testified that she had not been to Barney's Bar on the night of the murder and that she had not said so to Officer Swabash or to anyone.  (Tanner Dep. 275, 277-78.) Therefore, a question of fact remains as to whether Defendant fabricated his statement that Plaintiff said she was at the bar on the night of the murder.

Finally, Defendant relies on *Butler v. City of Detroit*, 936 F.3d 410 (6th Cir. 2019) as support for the proposition that he did not *knowingly* fabricate the aforementioned evidence against Plaintiff.  The officer in *Butler* allegedly made false statements in a warrant affidavit stating that he had observed activity at the target location and saw an associate enter the plaintiff's home. *Butler*, 936 F.3d at 417.  The Sixth Circuit noted these misrepresentations could be "just as consistent with negligence or innocent mistake" as opposed to "'a deliberate falsehood or [] reckless disregard for the truth.'"  *Id.* at 418-19 (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).  However, unlike the officer in *Butler*, Defendant was allegedly fabricating the statements of the accused, not merely misrepresenting his own impressions.  If in fact Plaintiff had never made these statements, a jury could find that Defendant knowingly or recklessly fabricated

evidence when he documented and subsequently provided testimony attributing these statements to Plaintiff.  Accordingly, a genuine dispute of material fact exists as to whether Defendant fabricated evidence in violation of Plaintiff's Fourth and Fourteenth Amendment rights.

### 2. Qualified Immunity

First, the right to be free from prosecution based on fabricated evidence was clearly established at the time of Plaintiff's arrest and prosecution.  *Jackson v. City of Cleveland*, 925 F.3d 793, 825 (6th Cir. 2019) ("[A]s far back as 1935, the Supreme Court recognized that the introduction of fabricated evidence violates 'the fundamental conceptions of justice which lie at the base of our civil and political institutions.'" (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935))); *Ferris v. City of Cadillac*, 726 F. App'x 473, 479 (6th Cir. 2018) ("We have observed that a criminal defendant's right to be free from prosecution based on fabricated evidence existed at least as early as 1992." (citing *Gregory v. City of Louisville*, 444 F.3d 725, 744 n.8 (6th Cir. 2006))).

According to Defendant, however, the proper question to ask in determining whether Plaintiff's right was clearly established is: "did Plaintiff present any cases putting Walters on notice that he would violate [Plaintiff's] [F]ourth [A]mendment rights by including in his report that Tanner said she was at the bar that night, which she also told the polygrapher, while also reporting that she later recanted, even though she was found to have been untruthful in her polygraph exam?"  (Def. Walters's Reply Br. in Supp. of Mot. for Summ. J. 11, ECF No. 108.)  Defendant's construction of the inquiry requires the Court to assume his report was truthful.  If in fact Plaintiff's deposition and trial testimony stating that she never told Defendant or Officer Swabash that she was at Barney's Bar that night is true, then Defendant's report would constitute

a fabrication of evidence.  Moreover, Defendant's construction fails to consider the other statements Plaintiff testified that he fabricated.[6]

Second, as explained above, a genuine issue of material fact exists as to whether Defendant fabricated evidence in violation of Plaintiff's Fourth and Fourteenth Amendment rights.  Because Plaintiff's constitutional right is clearly established and a genuine dispute of material fact exists as to whether Defendant's conduct constituted a constitutional violation, Defendant is not entitled to qualified immunity.

### B. Malicious Prosecution

#### 1. Merits

A claim of malicious prosecution premised on a Fourth Amendment violation requires a showing of the following elements:

> (1) that a criminal prosecution was initiated against the plaintiff and that the defendant "made, influenced, or participated in the decision to prosecute;" (2) that the state lacked probable cause for the prosecution; (3) that the plaintiff suffered a deprivation of liberty because of the legal proceeding; and (4) that the criminal proceeding was "resolved in the plaintiff's favor."

*Jones v. Clark Cnty.*, 959 F.3d 748, 756 (6th Cir. 2020) (quoting *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010)).  There is no dispute as to the last two elements.  Plaintiff suffered a deprivation of liberty for over seventeen years in prison, the Sixth Circuit found that Plaintiff was convicted based on insufficient evidence, and it set aside her conviction.  Accordingly, the Court directs its attention to the first two elements.

---

[6] In relation to the June 7, 1995, interrogation in the squad car, Defendant's report states, "HATTIE TANNER indicated to both officers that she did remember telling reporting officer when she looked at the photograph of the murder weapon that it was her knife.  She went on to make further statements regarding the knife stating that we should find her fingerprints as well as DION [PAAV'S] fingerprints on the knife."  (Investigation Report 14, ECF No. 93-8.)

### (a) Defendant's Participation in the Decision to Prosecute

The fact that an officer "did not *make* the decision to prosecute does not per se absolve them from liability." *Sykes*, 625 F.3d at 311.  The Fourth Amendment prohibits "unreasonable seizures." *Newman v. Twp. of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014).  "A police officer violates those restrictions [] when his deliberate or reckless falsehoods result in arrest and prosecution without probable cause." *Id.*  "For instance, liability extends to an officer who included falsehoods in her investigatory materials, knowing that prosecutorial reliance is likely, where those materials actually influenced the prosecutor's ultimate decision to bring charges." *Jones v. City of Elyria*, 947 F.3d 905, 918 (6th Cir. 2020) (citing *Jackson v. City of Cleveland*, 925 F.3d 793, 820-21 (6th Cir. 2019)).

Plaintiff alleges that Defendant included fabricated statements in an investigation report prepared after his June 7, 1995, interrogation of Plaintiff in a squad car.  In 2000, Jeffrey Kabot, a then Assistant Prosecuting Attorney for Calhoun County, reviewed the case file on Watson's murder and brought it to the attention of Prosecutor Susan Mladenoff, who authorized the charges against Plaintiff.  When speaking of the decision to prosecute, Kabot emphasized Watson's closing procedure at Barney's Bar, where she would only close the bar in the presence of a regular customer like Cady, not a stranger.  (Aff. of Jeffrey Kabot ¶ 11, ECF No. 102.)  In Kabot's opinion, this habit evidence coupled with Plaintiff's admission to being with Cady on the night in question and Plaintiff's history of assault with a knife formed the strongest evidence against Plaintiff.  (*Id.* ¶¶ 11-13.)  However, Kabot also stated:

> 15. I recall there was a transcript of an interview of Hattie Tanner conducted by Dave Walters in the file prior to the authorization of charges.
> 16. I recall reading that transcript and found that Hattie Tanner had made some incriminating statements during the interview, which she ultimately denied making during the trial.
> . . .

18. I recall discussing all the above points and strategies with Prosecutor Mladenoff who authorized the charges against Hattie Tanner.

(*Id.* ¶¶ 15, 16, 18.) Kabot and Mladenoff knew of, read, and discussed the Defendant's investigatory report prior to the initiation of charges. Viewed in the light most favorable to the Plaintiff, a jury could conclude that Defendant's investigation report influenced Mladenoff's ultimate decision to charge Plaintiff.

Defendant argues that because he was no longer the lead detective when the case was re-opened, he could not have participated in the decision to prosecute. This argument is unpersuasive. Defendant created the investigatory report in 1995 after conducting the May 24, 1995, video interrogation and June 7, 1995, squad car interrogation. (Pl. Compl. ¶ 31.) Defendant was then promoted to sergeant in 1997 and David Adams took over as lead detective before the case was re-opened in 2000. (Walters Dep. 123, ECF No. 93-22; Tr. of Prelim. Hr'g 127, ECF No. 93-2.[7]) This fact alone does not "clearly establish the lack of influence [Defendant] had on the prosecutions decision." (Br. in Supp. of Def.'s Mot. for Summ. J. 20, ECF No. 93.) As stated above, the prosecution knew of, read, and discussed the Defendant's investigatory report prior to authorizing charges against Plaintiff, and Defendant remained involved in the case by testifying at the preliminary hearing and then the trial.

### (b) Probable Cause

Probable cause exists where "the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021)

---

[7] The transcript of the preliminary hearing is included in ECF Nos. 93-2, 95-2, 100.

(quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).  "A probable cause determination is based upon the 'totality of the circumstances' and must consider 'both the inculpatory and exculpatory evidence.'"  *Jones v. Clark Cnty.*, 959 F.3d 748, 757 (6th Cir. 2020) (quoting *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015)).

A judicial determination of probable cause following a preliminary hearing "has no preclusive effect *if* there is evidence that the claim of malicious prosecution is based on a police officer's supplying false information to establish probable cause."  *Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir. 2007) (citing *Hinchman v. Moore*, 312 F.3d 198, 202-03 (6th Cir. 2002)).  At the preliminary hearing, Defendant provided testimony about the May 24, 1995, and June 7, 1995, interrogations, including the allegedly fabricated statements.  (*See* Tr. of Prelim. Hr'g 54-63.)  David Wallace—lead Assistant Prosecuting Attorney on the case—relied on Defendant's testimony to establish probable cause.  Wallace argued:

> The question then of course is, was the defendant involved and for probable cause purposes I assume we've shown that.  One, her statement to Detective Walters where she told Detective Walter and this Court heard, she admitted to being at Barney's that night, the night of the murder.  Two, she stated the knife that was found at the scene of the crime is her knife.  Three, that the knife that was found, because the stipulation had the victim's blood on it I think is a safe statement to argue that that's the murder weapon that was found in this case.

(Tr. of Prelim. Hr'g 158-59.)  Judge Samuel I. Durham, Jr. of the Tenth District Court for the County of Calhoun found probable cause to believe Plaintiff committed the offense, at least in part, based on Defendant's testimony at the preliminary hearing.  Judge Durham stated:

> So having placed it all on the record, each of those pieces of evidence that are circumstantial by themselves are probably not sufficient to establish probable cause.  But combining them all together, her false statements to David Walters concerning her whereabouts in her initial statement, the fact that her blood matches 4 percent of the population, the fact that it is her knife that was found in close proximity to the bloodstain that was left probably by the perpetrator that matches her, the fact that she was at Barney's at 1:30 a.m. in the morning, all those facts combined together in the Court's mind does

establish probable cause that Ms. Tanner was in fact the person that was in the bar and in fact committed these offenses.

(*Id.* 171.)   Because the allegedly false or fabricated evidence was relied upon by both the prosecutor and judge to establish probable cause at the preliminary hearing, the prior judicial determination of probable cause is not dispositive in this case.

Removing the allegedly false or fabricated evidence from the inquiry, Defendant points to a host of circumstantial evidence to establish probable cause.  First, Plaintiff has a criminal history of assaulting individuals with knives.  A suspect's prior criminal history is relevant to the probable cause inquiry but is by no means dispositive.  *See United States v. Wagers*, 452 F.3d 534, 541 (6th Cir. 2006).

Second, Plaintiff failed a polygraph examination.  A failed polygraph examination carries minimal persuasive weight in a probable cause inquiry.  *Lopez v. Ruhl*, 584 F. Supp. 639, 644 n.2 (W.D. Mich. 1984) (explaining that the court "discovered no cases in which the results of a polygraph voluntarily undertaken by an individual under suspicion were used to support a probable cause finding," but in the context of the case could carry "some slight weight").

Third, Plaintiff made incriminating statements before and during the polygraph examination conducted by Officer Swabash on June 7, 1995.  The statements made before the examination are the statements Plaintiff testified Defendant fabricated.  The Court will not consider these statements in the probable cause inquiry.  With respect to the statements made during the polygraph examination,[8] Plaintiff allegedly stated (i) that she and Cady traveled to Barney's Bar at approximately 1:30 a.m. on the night in question; (ii) that Cady went inside the bar to cash a check while she remained in the car for 10 to 15 minutes; and (iii) that Paav had a

---

[8] In Michigan, "statements made while submitting to a polygraph examination are generally admissible."  *People v. Gernagin*, No. 316615, 2015 WL 340127 (Mich. Ct. App. Jan. 27, 2015) (citing *People v. Ray*, 430 N.W.2d 626, 628-29 (Mich. 1988)).

knife with a chipped end much like the murder weapon.  Plaintiff's alleged statements place her in the parking lot of the crime scene on the night in question.  However, Plaintiff's alleged statements also place Cady inside Barney's Bar on the night in question and connect Paav to the murder weapon.  (*See also* Bedford Twp. Police Dept. Case Review Sheet 36, ECF No. 93-4.)  Moreover, on May 3, 1995, Plaintiff told Officer Wise that she had been with Cady smoking crack cocaine at her home on the night in question until Cady left alone to cash a check to buy more crack cocaine.  She further stated that at she had only been to Barney's Bar once, five or six years ago.  (*Id.* at 37.)

Fourth, the blood found on the sink at Barney's Bar matches Plaintiff's blood type.  Laboratory Scientist Marie Bard-Curtis testified during the preliminary hearing that she conducted blood and pGM testing on Susan Watson, Cady, Paav, and Plaintiff.  Only Plaintiff's blood type and pGM subtype matched that of the sample.  (Tr. of Prelim. Hr'g 48-49.)  Additionally, Bard-Curtis noted that only 4.2% of the African American population has this combination of blood type and pGM subtype.  (*Id.* at 50.)  Notably, Bard-Curtis failed to provide any statistics on what percentage of the general population has this combination of blood type and pGM subtype.  (*Id.*)  Lastly, Constance Roberts, Plaintiff's former cellmate, stated that Plaintiff told her she was at Barney's Bar on the night in question.[9]  (Roberts Interview.)

When considering the totality of the circumstances and viewing the evidence in the light most favorable to Plaintiff, a genuine question of fact remains as to the existence of probable cause.  Plaintiff "need only make a 'minimal showing of credibility . . . that the defendants did not have probable cause.'"  *Jones*, 959 F.3d at 757 (quoting *Yancey v. Carroll Cnty.*, 876 F.2d 1238, 1243 (6th Cir. 1989)).  "Unless 'there is only one reasonable determination possible,' this is a jury

---

[9] Roberts later admitted she learned the information from another cellmate, not Plaintiff.  (Br. in Supp. of Def.'s Mot. for Summ. J. 26, FN.4.)  Defendant did not know this at the time he submitted his warrant request in 1995, but the prosecution did know this upon initiating criminal charges and arguing for probable cause at the preliminary hearing in 2000.  *Id.*

question." *Id.* (quoting *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002)).  Here, more than one reasonable determination is possible based on the aforementioned evidence.  Accordingly, a genuine dispute of material fact exists with respect to the probable cause inquiry.  Because a genuine dispute of material fact exists as to both Defendant's participation in the decision to prosecute and probable cause, summary judgment is denied with respect to the claim of malicious prosecution.

### 2. Qualified Immunity

First, the right to be free from seizure and prosecution based on fabricated evidence was clearly established at the time of Plaintiff's arrest and prosecution.  *See Spurlock v. Satterfield*, 167 F.3d 995, 1006-07 (6th Cir. 1999) ("[A] reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures . . . .  Similarly, a reasonable police officer would be on notice that unlawfully detaining a suspect, despite the fact that the evidence used to detain that individual was fabricated, would also be unlawful."); *King v. Harwood*, 852 F.3d 568, 582-83 (6th Cir. 2017) ("[I]ndividuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has 'made, influenced, or participated in the decision to prosecute the plaintiff' by, for example, 'knowingly or recklessly' making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants." (quoting *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015))).  Defendant argues he did not knowingly fabricate the evidence upon which Plaintiff's malicious prosecution claim rests.  However, as explained in Section IV.A.1(c) above, this argument is unpersuasive. Accordingly, Defendant's argument that Plaintiff's right was not clearly established fails.

Second, as explained above, a genuine issue of material fact exists as to whether Defendant influenced or participated in the decision to prosecute Plaintiff and whether the state had probable

cause.  Because Plaintiff's constitutional right is clearly established and a genuine dispute of material fact exists as to the constitutional violation, Defendant is not entitled to qualified immunity.

### C. Collateral Estoppel

Defendant contends that collateral estoppel precludes Plaintiff from relitigating the issues of probable cause and fabrication of evidence.

> Under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts are required to "give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." The preclusive effect of a state court judgment is determined by state law.

*Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019) (internal citations omitted).  "Under Michigan law, issue preclusion applies when 1) there is identity of parties across the proceedings, 2) there was a valid, final judgment in the first proceeding, 3) the same issue was actually litigated and necessarily determined in the first proceeding, and 4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding."  *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001) (citing *People v. Gates*, 452 N.W.2d 627, 630-31 (Mich. 1990)).  "Michigan law [also] allows 'crossover estoppel,' which precludes the relitigation of an issue from a criminal proceeding in a subsequent civil proceeding, and vice versa."  *Peterson*, 931 F.3d at 554 (quoting *Barrow v. Pritchard*, 597 N.W.2d 853, 855-56 (Mich. Ct. App. 1999)).

Defendant argues that the issue of probable cause was fully litigated at the preliminary hearing before Plaintiff was bound over for trial in the Circuit Court.  However, when a criminal judgment has been vacated, the trial court's interlocutory rulings merge with the final judgment and are vacated as well.  *Peterson*, 931 F.3d at 554 ("[A] vacated judgment 'technically leav[es] nothing to which we may accord preclusive effect." (quoting *Dodrill v. Ludt*, 764 F.2d 442, 444

(6th Cir. 1985))).  Defendant attempts to distinguish *Peterson* by arguing that the probable cause finding was not vacated when Plaintiff's criminal conviction was vacated because the probable cause finding is a separate valid, final judgment as Plaintiff was assigned a new judge and case number after Plaintiff was bound over to the Circuit Court.  (Def. David Walters's Reply Br. in Supp. of Mot. for Summ. J. 15.)  Because Defendant provides no support for the proposition that the probable cause finding is not vacated when the criminal conviction is, the Court is not persuaded that Plaintiff is collaterally estopped from litigating this issue.

Moreover, the identity of issues element under Michigan law is not satisfied.  The Sixth Circuit has held that where a plaintiff's claims are based "on the grounds that the defendant-officers had knowingly supplied the magistrate with false information in order to establish probable cause," collateral estoppel does not apply.  *Darrah*, 255 F.3d at 311 (citing *Josey v. Salisbury*, No. 92-2093, 1993 WL 476974 (6th Cir. Nov. 18, 1993)).  The Sixth Circuit explained that such plaintiffs are "not attempting to relitigate the identical issue of whether probable cause exists; rather, they [are] arguing that the officers misstated material facts in order to establish probable cause at the state level."  *Id.*; *see also McCollum v. Bahl*, 711 F. Supp. 2d 803, 815 (W.D. Mich. 2010) ("McCollum's claims in this case are similar to the claim of the plaintiff in *Darrah*, in that McCollum alleges that Bahl fabricated McCollum's confession and used the confession to support a probable cause determination at the preliminary examination by testifying about how it fit with his theory of the case.").  Here, Plaintiff argues Defendant made misrepresentations in both his investigation report and his testimony at the preliminary hearing that amount to a falsified confession.  At the preliminary hearing, Judge Durham relied on Defendant's testimony to find probable cause.  (Tr. of Prelim. Hr'g 171.)  Accordingly, the state court's determination of probable cause at the preliminary hearing is not identical to the issue being litigated in this case.

Defendant cites *Lust v. Plummer*, No. 17-12170, 2018 WL 5264221 (E.D. Mich. Oct. 23, 2018) in support of his argument that Plaintiff is relitigating an identical issue because she has not proffered new evidence to support her claims of fabrication of evidence or malicious prosecution. In *Lust*, the Michigan Court of Appeals had previously considered Lust's own testimony when reversing the trial court's determination that probable cause was lacking. *Lust,* 2018 WL 5264221, at *4. The court found that Lust's "proffer of the same testimony that was considered by the state appellate court amounts to a veiled attempt to relitigate probable cause." *Id.*

Unlike *Lust*, Plaintiff did not proffer her own testimony, that she relies upon in this case, at the preliminary hearing. In his summary of the evidence against a finding of probable cause during the preliminary hearing, Plaintiff's attorney relied on Cady's testimony and the prosecution's lack of direct evidence:

> Briefly, Judge. Mr. Cady was the person that was in the company of the defendant that during the periods of the night and he knew where she was and she wasn't with him during the trip to--in his attempt to cash a check at Barney's nor any other time other than getting some crack cocaine in the city of Battle Creek. He--he places her back home at the time of his travels which is very inconsistent with what's offered by the government. They search Hattie's house. They searched the car that they connect with Hattie during this night. They found absolutely nothing as compared to a crime scene where there was a lot of blood spattered throughout and so forth and essentially a bloody crime scene. One would expect to find some evidence connecting Ms. Tanner to this in a search of the house or in the search of Mr. Cady's car if you were to adopt the theory offered by the government. There is no documented statement by Ms. Tanner suggesting what the government suggests and other than that, Judge, I'll leave it to you to decide whether there's enough to bind over.

(Tr. of Prelim. Hr'g 160-61.) Plaintiff now relies on the audio recording of the May 24, 1995, interrogation which Plaintiff's attorney did not have access to at the time of the preliminary hearing.[10] Because Plaintiff relies on her own testimony and the audio recording of the May 24,

---

[10] At the preliminary hearing, Plaintiff's attorney only had access to the written transcription of the May 24, 1995, interrogation. Plaintiff's attorney stated, "Judge, I think on the issue of the tape, we've talked things over and the prosecutor has agreed to, as soon as reasonably convenient, provide me with a copy of the tape associated with this

1995, interrogation to support her claim that Defendant fabricated statements to establish probable cause, Plaintiff is "not relitigating the issue of probable cause, [she is] challenging the integrity of the evidence used to establish probable cause." *Buttino v. City of Hamtramck*, 87 F. App'x 499, 505 (6th Cir. 2004).  Thus, Plaintiff is not collaterally estopped from relitigating the issues of probable cause and fabrication of evidence.

### D. *Brady* Violation

"Under *Brady v. Maryland*, the prosecution in a criminal case has a constitutional duty to disclose material, exculpatory evidence." *McNeill v. Bagley*, 10 F.4th 588, 598 (6th Cir. 2021) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  "'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused . . . ; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)).  Like prosecutors, police officers are also subject to *Brady* obligations.  *Moldowan v. City of Warren*, 578 F.3d 351, 378 (6th Cir. 2009) ("Because prosecutors rely so heavily on the police and other law enforcement authorities, the obligations imposed under *Brady* would be largely ineffective if those other members of the prosecution team had no responsibility to inform the prosecutor about evidence that undermined the state's preferred theory of the crime.").  However, "'*Brady* is concerned only with cases in which the government possesses information which the defendant does not.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 824 (6th Cir. 2019) (quoting *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007)).  Therefore, "if a defendant knows at the time of trial that the government has fabricated evidence, [] officers do not violate *Brady* by failing to tell prosecutors that evidence has

---

interview." (Tr. of Prelim. Hr'g 69.)  In this case, Plaintiff relies on the audio recording to fill in and clarify portions of the written transcription.

been fabricated." *Id.* at 824-25; *see also Saunders-El v. Rohde*, 778 F.3d 556, 562-63 (7th Cir. 2015).

Plaintiff alleges that Defendant violated his *Brady* obligation by concealing the allegedly fabricated evidence from the prosecutor.  (Pl. Compl. ¶ 72.)  However, at the time of trial, Plaintiff knew of the allegedly fabricated evidence.  Defendant testified as to the allegedly fabricated statements during the preliminary hearing and Assistant Prosecuting Attorney Wallace relied on them in his argument to establish probable cause.  (Tr. of Prelim. Hr'g 57-61, 158-59.)  Moreover, Plaintiff later refuted the statements at trial.  With respect to the alleged statements made during the May 24, 1995, interrogation, Plaintiff testified that "[a] lot of things that [Defendant] said in there that I did not say anyway."  (Trial Tr. 44, ECF No. 93-24.)  With respect to the alleged statements made in the police car on June 7, 1995, Plaintiff testified that she "didn't make any statement in his car when he was driving."  (*Id.* 45.)  Because Plaintiff knew of the allegedly fabricated evidence at the time of trial, no genuine issue of material fact exists as to whether the Defendant failed to meet his *Brady* obligation.[11]  Accordingly, the Court will dismiss the *Brady* claim.

## V. CONCLUSION

For the reasons stated above, the Court will grant Defendant's motion for summary judgment on the *Brady* violation and deny the motion on all other grounds.  An order will enter consistent with this Opinion.

Dated: October 14, 2022                          /s/ Hala Y. Jarbou
                                                  HALA Y. JARBOU
                                                  CHIEF UNITED STATES DISTRICT JUDGE

---

[11] Plaintiff likewise failed to address the *Brady* violation in her response to Defendant's motion for summary judgment. (*See* Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J.)